# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JEFFERY JEROME HARRIS; SHARON DENISE FAILS; TYRANCE HARRIS; and HOLLY POWE,**<br>**Plaintiffs,**<br>**vs.**<br>**UNITED STATES OF AMERICA,**<br>**Defendant.** | **Civil No. 1:26-cv-00184-JB-MU** |

**DECLARATION OF KAREN WESSON IN SUPPORT OF THE UNITED STATES OF AMERICA'S MOTION TO DISMISS**

I, Karen Wesson, affirm and declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA" or the "Agency"), or on information supplied to me by EPA employees:

1. My work experience in the area of air quality data spans more than twenty years and includes multiple positions within EPA as well as positions outside of EPA.
2. I have an undergraduate Bachelor of Science degree from the University of Virginia in Astrophysics and a Master's Degree in Environmental Science from Duke University. In addition, I have completed numerous on-the-job training programs and am listed as an author on more than eight scientific publications regarding a variety of aspects of complex air quality monitoring, modeling, and considerations.
3. I am currently the Director of the Air Quality Assessment Division ("AQAD") within the Office of State Air Partnerships ("OSAP") which is within the Office of Air and Radiation ("OAR") at EPA, a position I have held since January 2025.

4. Prior to my role as Director of AQAD, I supervised a Group within the Office of Air Quality Planning and Standards (within the OAR) which was responsible for leading the periodic reviews of the National Ambient Air Quality Standards ("NAAQS"). In addition to this role, I have held other positions involving air quality and data analysis within EPA.

5. AQAD is the division at EPA Headquarters that has primary responsibility for leading policy-relevant characterization and analysis of air emissions and air quality through the design, development, and use of state-of-the-science tools.

6. As part of my duties as Director of AQAD, I oversee six Branches within my Division involved in the development and implementation of national programs to support Clean Air Act ("CAA") air monitoring, modeling, and analysis for multiple pollutants including the NAAQS and their precursors. At a high level, this work involves assessing the national air pollution control programs under my jurisdiction by collecting, analyzing, and communicating about air data. In the course of my work, I routinely collaborate with all ten EPA Regional Offices as well as other offices across the EPA. AQAD also supports other Federal agencies, State, local, and Tribal air quality control agencies by proactively developing data, analyses, methods, models and tools and providing CAA implementation support. AQAD serves as the central hub for developing and assessing air quality data and technical methods. Further, datasets and tools developed by AQAD provide the foundation for characterizing air quality associated with criteria and hazardous air pollutants in the U.S. as prescribed under authority of the CAA and for evaluating the impacts of air quality management policies.

7. The EPA maintains air quality criteria for pollutants that must reflect the latest scientific knowledge regarding adverse impacts on public health and welfare. 42 U.S.C. §7408(a).

After issuing criteria for a pollutant, the EPA promulgates two types of NAAQS: primary and secondary. "Primary" NAAQS are set "based on such criteria" at a level that the Administrator judges to be "requisite" to protect the "public health." Id. § 7409(b)(1). "Secondary" NAAQS are set "based on such criteria" at a level that the Administrator judges to be "requisite" to protect the "public welfare." Id. § 7409(b)(2).

8. The EPA first established NAAQS for lead in 1978 (43 FR 46246). Both the primary and secondary standards were set at a level of 1.5 micrograms per cubic meter ($\mu g/m^3$), measured as Pb in total suspended particulate matter (Pb-TSP), not to be exceeded by the maximum arithmetic mean concentration averaged over a calendar quarter. In 2008, EPA revised the level of the primary and secondary standards to 0.15 $\mu g/m^3$ (73 FR 66964). EPA retained the indicator of Pb-TSP, but revised the averaging time to a rolling 3-month period with a maximum (not-to-be-exceeded) form, evaluated over a 3-year period.

9. The CAA requires states to adopt and submit to EPA within 3 years of promulgation of a NAAQS a plan which "shall provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, compile, and analyze data on ambient air quality." 42 USC § 7410 (a)(2)(B).

10. Beyond this statutory language, the CAA does not otherwise specify details on what devices, methods, systems, and procedures are appropriate and necessary to monitor ambient air quality. This leaves discretion to EPA to interpret the CAA provisions and otherwise leaves states discretion in how to meet applicable CAA and regulatory requirements.

11. EPA and its partners in State, local, and tribal air monitoring programs work closely to design and implement ambient air monitoring networks to meet multiple monitoring

objectives including: providing air pollution data to the general public in a timely manner; supporting compliance with the NAAQS and emissions strategy development, and supporting air pollution research studies. Monitoring agencies conduct network assessments at least every five years and each year submit to EPA an annual monitoring network plan intended to meet current and emerging needs of the networks. In making plans for the most optimized ambient air monitoring networks, monitoring agencies must meet minimum monitoring requirements. These minimum monitoring requirements provide for what pollutants to measure, how many monitoring sites a network needs, and where to locate sites. Not all counties have monitors, and those that do have monitors do not necessarily measure every pollutant. Of the pollutants measured, not all are measured every day.

12. EPA's regulations require states to submit annual monitoring network plans (commonly referred to as "ANPs") each year and network assessments every five years. EPA's regulations at 40 CFR Part 58 outline minimum requirements for monitoring networks. The regulations identify three objectives that must be considered individually in designing a network plan. Appendix D to Part 58, paragraph 1.1. In order to meet the objectives, EPA regulations note that, "[m]onitoring sites must be capable of informing managers about many things, including the peak air pollution levels, typical levels in populated areas, air pollution transported into and outside of a city or region, and air pollution levels near specific sources." Id at 1.1.1. In addition, "[t]he optimum size of a particular network involves trade-offs among data needs and available resources. Id at 1.1.2. EPA and states must exercise considerable judgment in designing a network plan.

13. In the rule revising the NAAQS for lead in 2008, EPA revised associated ambient air lead monitoring requirements (73 FR 66964). The monitoring requirements were revised on December 27, 2010 (75 FR 81127). States are required to conduct ambient air lead monitoring near lead sources which are expected to or have been shown to contribute to a maximum lead concentration in ambient air in excess of the NAAQS, taking into account the logistics and potential for population exposure. Appendix D to Part 58, paragraph 4.5. States must necessarily exercise judgment in making this determination. At a minimum, there must be one source-oriented monitor located to measure the maximum lead concentration in ambient air resulting from each source that emits 0.50 tons per year for industrial sources of lead (e.g., lead smelters and foundries). The emission threshold for airports is 1.0 tons per year. *Id*.

14. EPA reviews states' ANPs to determine whether they meet minimum regulatory requirements. If the plan meets minimum requirements, EPA will otherwise defer to the state to determine whether to conduct any additional monitoring for NAAQS pollutants, such as lead. In particular, EPA will defer to the state in accounting for logistics and potential for population exposure in establishing the lead monitoring network as long as minimum requirements are met.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 5, 2026

Karen H Wesson
Division Director, Air Quality Assessment Division
Office of State Air Partnerships
Office of Air and Radiation
U.S. Environmental Protection Agency